UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
AIOI NISSAY DOWA INSURANCE           :
COMPANY LTD.,                         :
                        Plaintiff,    :           11 Civ. 1330 (JPO)
                                      :
              -v-                     :           MEMORANDUM AND
                                      :                 ORDER
PROSIGHT SPECIALTY MANAGEMENT         :
COMPANY, INC., f/k/a MUTUAL MARINE    :
OFFICE, INC., NEW YORK MARINE AND     :
GENERAL INSURANCE COMPANY, and        :
GOTHAM INSURANCE COMPANY,             :
                                      :
                        Defendants.   :
---------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

   This is an action between an aviation insurer and its reinsurer concerning losses

stemming from, among other things, the catastrophic events of September 11, 2001.  Following a

bench trial, the Court issues the following findings of fact and conclusions of law, as required by

Rule 52(a) of the Federal Rules of Civil Procedure.  After carefully considering the language of

the relevant contracts, evidence introduced at trial, the arguments of counsel, and the controlling

law on the issues presented, the Court concludes that ProSight breached its contract with Aioi

and that Aioi is entitled to damages.

I.     **Procedural Background**

   On November 21, 2011, Defendants ProSight Specialty Management Company

("ProSight Specialty"), New York Marine and General Insurance ("NY Marine"), and Gotham

Insurance Company ("Gotham") (together, "ProSight") moved for summary judgment against

Plaintiff Aioi Nissay Dowa Insurance Company ("Aioi").  (Dkt. No. 83.)  Aioi cross-moved for

summary judgment on December 16, 2011.  (Dkt. No. 96.)  On September 13, 2012, the parties'

motions were denied from the bench.  (Dkt. No. 127.)  In denying the parties' motions for

summary judgment, the Court explained:

> I . . . don't think it's so clear that I can grant summary judgment to
> either party here. . . .  I think a trial about what this contractual
> language means . . . would be helpful. . . .  [T]hen I'm deciding not
> that this is clearly unambiguous and there's no genuine issue of
> material fact but I'm deciding by a preponderance of the evidence
> this is how I think this contract . . . is properly interpreted . . . .  So
> my decision is to deny both parties' motions for summary
> judgment and my hope is that, given my view on the setoff
> arguments, and given that I think that the reading of the contract is
> better on AIOI's side but that the equities are better on ProSight's
> side . . . that a bench trial on the proper reading of the agreement is
> the right result.

(Dkt. No. 128 at 82-83).

The Court held a bench trial from February 26, 2013 to March 1, 2013.  The parties

subsequently filed proposed findings of facts and conclusions of law with citations to the

evidence presented at trial.

## II.     Findings of Fact

### A.     The Parties

Aioi is a corporation organized under the laws of Japan, with its principal place of

business in Japan.  It is engaged in the business of insurance and reinsurance.[1]

ProSight Specialty is a corporation organized under the laws of New York with its

principal place of business in New York.  ProSight Specialty is an insurance manager that

underwrites and manages insurance and reinsurance contracts for affiliate insurance companies.

NY Marine, ProSight Specialty, and Gotham are subsidiaries of ProSight Specialty Insurance

Holdings, Inc.

---

[1] Aioi is the successor to Chiyoda Fire and Marine Insurance Co., Ltd. and Aioi Insurance Co., Ltd.  For simplicity's sake, these companies are referred to as "Aioi."

During the period relevant to this lawsuit, 1999 to 2001, ProSight issued property and liability insurance policies to airlines.  Because the value of the aircrafts and the potential liabilities of the airlines are so significant, a panel of insurance companies participates in the coverage of an airline, each company assuming a specific share.  During the relevant period, ProSight typically took a 3% to 5% share of an aviation policy.

ProSight purchased reinsurance coverage for its aviation business.  These contracts usually took the form of excess of loss contracts—in other words, they indemnified ProSight for losses in excess of a specific attachment point, up to a stated limit, which is the maximum amount the reinsurer will pay for a single loss.

**B.      The Relevant Agents**

Thomas Guarnera was the ProSight employee responsible for purchasing the relevant contracts.  ProSight used the services of Willis Re, Inc. ("Willis") to purchase its reinsurance contract.  Willis acted on behalf of ProSight in negotiating and contracting with reinsurers.  Willis did not negotiate or execute any reinsurance contracts directly with Aioi.  Instead, Willis dealt with Aioi's agent, Fortress Re., Inc. ("Fortress Re").

Fortress Re was a managing general agent which provided underwriting services to a pool of insurance companies.  Kenneth Kornfield, the president and chief underwriter of Fortress Re, had the sole absolute underwriting authority to execute reinsurance contracts on behalf of Fortress Re.  The only business Fortress Re engaged in was managing an underwriting pool consisting of three member companies ("the Fortress Pool").  During the relevant period, the Fortress Pool consisted of Aioi, the Nissan Fire and Marine Insurance Company ("Nissan"), and the Taisei Fire & Marine Insurance Company, Ltd. ("Taisei").  Fortress Re had full authority to bind Aioi to the terms of any reinsurance contract.  Aioi did not consult with Fortress Re regarding the negotiation or terms of the relevant contracts.

3

In late 2001, Aioi terminated Fortress Re's authority to execute or renew contracts and settle claims.  Aioi terminated Fortress Re's management authority as of June 30, 2002.  In December 2001, Aioi hired Chiltington International Limited ("Chiltington") to advise Aioi on the relevant contracts.  In 2005, Quest Consulting (London) Limited ("Quest") replaced Chiltington and has adjusted those claims ever since.  Jeremy Fall was in charge of the Aioi account at Chiltington, and later, at Quest.  Fall was not involved in any aspect of the underwriting or negotiation of the contracts relevant to this action.

Chiltington, and later Quest, were hired by Taisei Re, which succeeded to certain of Taisei's contracts.  Graham Combes was in charge of the Taisei Re account at Chiltington and Quest.

### C.    The XOL Contracts

The Fortress Pool members were parties to four "excess of loss" reinsurance contracts, which reinsured ProSight for losses under policies issued from January 1, 2000 to March 31, 2002 ("the XOL Contracts").  (*See* Exs. 2, 43-45.)  In the two 2000 XOL Contracts, Aioi gave 48% of the coverage, while Taisei and Nissan each gave 26%.  In the two 2001 XOL Contracts, Aioi reinsured for 43.2% (48% of 90%), and Taisei and Nissan each reinsured for 23.4% (26% of 90%); the other 10% was insured by another party.  In total, Aioi received $8,910,000 in original premium from ProSight as consideration for entering into the XOL Contracts.

Under each XOL Contract, Aioi agreed to indemnify ProSight for ProSight's "Ultimate Net Loss" under all policies ProSight issued in the aviation business.

Each XOL Contract also contains a "Several Liability Clause (LSW[2] 1001 Reinsurance 8/94)," which provides:

---

[2] "LSW" stands for "London Standard Wording."

> The subscribing Reinsurers' obligations under contracts of reinsurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing Reinsurers are not responsible for the subscription of any co-subscribing Reinsurer who for any reason does not satisfy all or part of its obligations.

In the event of a covered loss, each of the four XOL Contracts requires ProSight to pay additional premiums, known as "reinstatement premiums."  Paying a reinstatement premium reinstates the amount of liability exhausted in the event of a loss, so that the reinsured is not left without reinsurance in the event of another loss.  Specifically, the XOL Contracts provide:

> In the event of a loss occurring hereunder the amount of liability exhausted shall be automatically reinstated from the time of such occurrence . . . .

> At the same time as the loss is settled hereunder the Reinsured shall pay the Reinsurers an additional premium in accordance with the provisions of the premium article . . . .

> The foregoing additional premium shall be based on a Total Loss to this Contract, lesser amounts being calculated on a Pro Rata Basis, the date of loss for this purpose being disregarded.

The reinstatement premiums payable to each reinsurer are calculated using the following formula: Original Premium x Reinstatement Rate x Covered Loss Limit x Reinsurer's Share = Reinstatement Share.  The XOL Contracts each provide for three full reinstatement premiums, meaning that coverage is reinstated following recovery of a claim until the aggregate amount reinstated equals three times the original coverage limit.

### D.    The RPP Contracts

The Fortress Pool is a party to seven reinstatement premium protection contracts that indemnify ProSight for reinstatement premium payments ("the RPP Contracts").  (*See* Exs. 46-53.)  The RPP Contracts are "slips," meaning they state the major terms of the contracts and

incorporate by shorthand reference several common terms, general conditions, and exclusions.[3] The slips are printed on Willis letterhead.  ProSight entered into these RPP Contracts in order to transfer the risk of paying reinstatement premiums, a risk it had assumed when it bought the XOL Contracts.  In total, Aioi received $5,225,418 in premiums from ProSight as consideration for entering into the seven RPP Contracts.

Each of the RPP Contracts states, under the heading "Class," that it covers the "Cost of Reinstatement Reinsurance in respect of the Reinsured's layer of" a particular contract.  "Cost of reinstatement reinsurance" means that, "[a]ssuming a loss under the [XOL Contracts], [ProSight] would be obligated to pay a reinstatement premium, and this cover would be protecting [ProSight] for that payment."  (Guarnera test., Trial Trans., 241:4-6.)  In the RPP Contracts, the allocation of indemnification between the members of the Fortress Pool is the same as in the XOL Contracts: 48% for Aioi, and 26% for both Nissan and Taisei. Each of the 2000 RPP Contracts states that Fortress Re's "Acceptance Hereon" is "100%," and the acceptance is made "for and on behalf of" Aioi for "48%."  Each of the 2001 RPP Contracts states that Fortress Re's "Acceptance Hereon" is "90%," and the acceptance is made "for and on behalf of" Aioi for "48%."  As with the XOL Contracts, the RPP Contracts have "Ultimate Net Loss Clause[s]." The RPP Contracts also contains the term "LSW 1001 (Reinsurance) – Several Liability Notice," meaning that the liability of each insurer is several and not joint.

---

[3] A slip is simply "[a] paper with particulars of a risk and proposed terms submitted by the broker to an underwriter, who may accept by initialing it and indicating on it the share he will assume, forming a contract pending further particulars in final form."  Graydon S. Staring, Law of Reinsurance § 2:10 (2013 ed.).  Six of the seven RPP Contracts contain the following term: "Agree sign slip policy.  No wording to be issued."  No wording was issued for any of the RPP Contracts.  The RPP Contracts are only several pages in length, and thus do not define many of the terms therein. Many of the same terms, however, are standard terms, widely used and commonly understood in the industry; many of the terms are also defined in the lengthier XOL Contracts.

### E.    ProSight's Losses

In a short span of time, ProSight incurred and paid a series of massive aviation losses covered under the XOL Contracts.  These included losses of American Airlines ("AA") and the Boeing Company ("Boeing") from the crash of American Flight 77 at the Pentagon; the losses of AA, Boeing, and United Air Lines ("United") from the crashes of American Flight 11 and United Flight 175 at the World Trade Center; and the losses of United and Boeing from the crash of United Flight 93 near Shanksville, Pennsylvania.[4]  All of these crashes occurred on September 11, 2011.  ProSight incurred other major losses in July 2000, October 2000, and October 2001, resulting from plane crashes in Paris, France, in Queens, New York, and in Taipei, Taiwan, respectively.

### F.    The Commutation Agreements

Shortly after the events of September 11, 2001 produced unprecedented aviation losses, it became evident that the Fortress Pool Members were facing massive financial liabilities.  Indeed, on November 22, 2001, Taisei filed for bankruptcy protection under Japanese law.  Recognizing that Taisei and Nissan lacked assets sufficient to pay their liabilities, ProSight sought to enter into commutation agreements with these reinsurers.  ProSight filed a proof of claim form in the Taisei reorganization on January 30, 2002.  On July 17, 2002, ProSight received a commutation offer from the Trustee of the Estate of Taisei.  That offer was accepted by ProSight in August 2002.  ProSight then commuted with Nissan in August 2003.

Under both commutation agreements, ProSight was paid a lump sum payment, in exchange for which the XOL and RPP Contracts with those parties were annulled.  The proof of

---

[4] United 93 was the flight in which several heroic passengers attempted to retake control of the plane from its al-Qaeda hijackers, during which the plane crashed in Pennsylvania.  The story of United 93 was recounted in the 2006 film *United 93*.

loss submitted by ProSight during the Tasei reorganization proceedings included an estimate of both its future claims against Tasei—including the XOL and RPP Contracts—and its future net reinstatement premiums, although the offer accepted by ProSight was far less than the submitted proof of loss.  ProSight's commutation offer to Nissan also acknowledged that any commutation should take into account future reinstatement premiums owed by ProSight.

As it turns out, the lump sum payments received by ProSight were substantially higher than the amounts that ProSight would have collected from Taisei or Nissan in the absence of commutation.[5]  In November 2003, ProSight made a commutation offer to Aioi, which Aioi declined.

The record indicates that ProSight did not inform Aioi of its commutations with Nissan and Taisei until on or about the commencement of this lawsuit.

### G.    Payments

From March 27, 2003 through January 19, 2010, Aioi made payments to ProSight under the RPP Contracts.[6]  Aioi paid ProSight by a combination of direct payment, offsets to other amounts owed between the parties, and ProSight's draws on a letter of credit posted by Aioi for ProSight's benefit.[7]  ProSight collected a total of $9,180,462.81 for indemnity under the RPP

---

[5] ProSight assumed that its losses stemming from the World Trade Center would constitute two events, but an arbitration panel found the World Trade Center loss to constitute a single event. *See Aioi Nissay Dowa Ins. Co. Ltd. v. ProSight Specialty Mgmt. Co., Inc.*, No. 12 Civ. 3274 (JPO), 2012 WL 3583176, at *2 (S.D.N.Y. Aug. 21, 2012).  This appears to account for a significant portion of the savings captured by ProSight.

[6] Prior to February 25, 2005, all of Aioi's payments under the RPP Contracts were toward the losses stemming from the crash in Queens, New York.

[7] A letter of credit is simply "a contract between the bank and the beneficiary of the letter." *Marino Indus. Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112, 115 (2d Cir. 1982).  Letters of credit are the mechanism by which "the parties to the commercial contract bring in a third party—the bank—to finance the transaction for them.  The bank's sole function is the financing; it is not concerned with or involved in the commercial transaction." *Id.*

Contracts, which is $3,540,955.27 more than it would have collected had it billed Aioi under

Aioi's theory of the RPP Contracts.  ProSight's bills to Aioi were not reduced when it entered

into commutation agreements with Taisei and Nissan; instead, ProSight continued to bill Aioi as

if it had not entered into commutation agreements with the other members of the Pool.[8]

On March 31, 2010, ProSight collected $11,982,179.93 under the XOL Contracts by

drawing on a letter of credit posted by Aioi.  This payment related to the settlement of property

damage claims on the World Trade Center losses.

## III.    Conclusions of Law

### A.    New York Breach of Contract Law

"The construction of an insurance contract is ordinarily a matter of law to be determined

by the court."  *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176,

180 (S.D.N.Y. 2003) (citing cases).  To establish a breach of contract claim under New York

law, a plaintiff must show:

> (1) that an agreement existed between it and the defendant, (2)
> what the respective obligations of the parties were, (3) that the
> plaintiff performed its obligations under the agreement, (4) that the
> defendant breached the agreement by failing to perform its
> obligations, and (5) that the plaintiff suffered damages as a result
> of the breach.

*Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.,* 807 F. Supp. 337, 341 (S.D.N.Y. 1992).

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of

the parties as revealed by the language they chose to use."  *Seiden Assocs., Inc. v ANC Holdings,*

*Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  "The best evidence of what parties to a written

agreement intend is what they say in their writing."  *Greenfield v. Phillies Records, Inc.*, 98

N.Y.2d 562, 569 (2002) (internal quotation marks and citation omitted).  "Thus, a written

---

[8] Or at least, this is how the individuals at Chiltington and Quest, who managed Aioi's claims, understood ProSight's bills.

agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms," *id.,* "without the aid of extrinsic evidence," *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks and citation omitted). If the language in an insurance policy is ambiguous, the court should examine the language "from the vantage point of the 'reasonable expectations and purposes of the ordinary person.'" *Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 695 (2d Cir. 1998) (internal quotation marks and citation omitted). The court may also "consider extrinsic evidence submitted by the parties to assist in determining their actual intent." *McCostis v. Home Ins. Co. of Indiana,* 31 F.3d 110, 113 (2d Cir. 1994) (citations omitted).

"Although contract interpretation normally requires inquiry into the intent of the contracting parties," the Second Circuit has warned that the question of "intent is not likely to be helpful when the subject of the inquiry is something the parties were not thinking about." *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487-88 (2d Cir. 1998). Accordingly, "where . . . evidence probative of intent is . . . both scant and unreliable, the burden of justifying a departure from the most reasonable reading of the contract should fall on the party advocating the departure." *Id.*

### B.    The Best Reading of the Contracts

As this Court indicated in denying the parties' motions for summary judgment, while the Contracts are ambiguous, the better reading of the language of the Contracts favors Aioi's interpretation. After hearing the evidence and the parties' arguments at trial, the Court concludes that Aioi's construction of the XOL Contracts remains more persuasive.

The RPP Contracts provide that Aioi "Accept[s] Hereon" liability for 48% of the "cost of reinstatement reinsurance." The RPP Contracts also have "Ultimate Net Loss Clause[s]," which preclude ProSight from recovering for amounts of reinstatement premiums that were not paid or

owed to Taisei or Nissan. Thus, the best reading of the RPP Contract limits Aioi's liability to 48% or 43.2% of the amounts that ProSight actually paid, following its commutations. To hold Aioi liable for more would violate the Ultimate Net Loss clauses. This reading also comports with the Several Liability Clause, which limits Aioi's liability under the RPP Contract to its share of the total cost of reinstatement, irrespective of the rest of the Pool's inability to pay.

ProSight proffers a different reading, which relies upon the argument that the XOL and RPP Contracts can only be understood as part of a single contract. As explained above, in both the XOL and RPP Contracts, Aioi was responsible for 48% of the Fortress Pool's indemnification. According to ProSight, the very "purpose of the RPP Contracts was to promote financial finality for both ProSight and its reinsurers by effectively eliminating the possibility of the payment of reinstatement premiums in exchange for an upfront prepayment of premium under the RPP Contracts to each of those same reinsurers." (ProSight Am. FFCL at ¶ 53.) ProSight argues that the XOL and RPP Contracts were purchased in a "package structure," "designed" in such a way that "each member of the pool undertook the same percentage shares on both the XOL and RPP Contracts." (*Id.* at ¶ 19; *accord id.* at ¶ 77). "Thus," argues ProSight, "in the event of a loss under one of the XOL Contracts, the amount of reinstatement premium owed by ProSight to Aioi under an XOL Contract would match the amount owed by Aioi to ProSight under the corresponding RPP Contract, thereby effectively eliminating ProSight's payment of reinstatement premium to Aioi under the XOL Contracts." (*Id.* at ¶ 56.). Aioi disagrees, arguing that, while Aioi agreed to indemnify 48% of both the XOL and RPP Contracts, it does not follow that, in any given circumstance, the loss owed by ProSight to Aioi under an XOL Contract would match the amount owned to ProSight under the corresponding RPP Contract.

The question whether the XOL and RPP contracts were separate or part of a package arguably affects the meaning of the contracts' Several Liability Clauses.  ProSight's argument is that, because the XOL and RPP Contracts were part of one combined contract, the Several Liability Clauses do not operate in the context of *each individual contract*, but rather span the XOL and RPP Contracts, limiting Aioi's ability to reduce its reinstatement premium payments based on the fate of Nissan and Taisei.  In other words, according to ProSight, the XOL and RPP Contracts provide that whether any one member of the Fortress Pool cannot pay under the XOL Contracts does not affect the amount any other member owes under the RPP Contracts.

The contention that the XOL and RPP Contracts should be viewed as part of a "package structure" is based in large part on the fact that the RPP and XOL Contracts have the same reinsurers, with the same shares of liability.[9]  According to ProSight, this illustrates the parties' intent to have each reinsurer offset the reinstatement premiums that would be paid to each insurer.[10]

---

[9] ProSight also argues that the undefined terms found in the RPP Contracts are defined via the XOL Contracts, which presumably suggests their interdependence.  However, because the relevant terms (such as "Ultimate Net Clause" and Several Liability Clause") were standard industry terms, it is not necessary that the XOL and RPP Contracts be integrated to determine what the undefined terms in the RPP Contracts meant.  Nor is it at all clear that the undefined terms in the RPP Contracts are meant to be defined via the XOL Contracts.  *Accord Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir. 1993) ("The efficiency of the reinsurance industry would not be enhanced by giving different meanings to identical standard contract provisions depending upon idiosyncratic factors in particular lawsuits.  The meaning of such provisions is not an issue of fact to be litigated anew each time a dispute goes to court.")

[10] ProSight has argued that the RPP and XOL Contracts are interrelated as a matter of New York law, and that they therefore "must be read and interpreted together."  *Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005).  Yet even if the contracts are interrelated, as a matter of law, this "does not mean that any provision contained in [one] document must be applied to all other documents that are part of the same transaction," as "[p]arties are free to enter into multiple contracts as part of a single transaction without the provisions in one contract governing another contract."  *Rosen v. Mega Bloks, Inc.*, No. 06 Civ. 3474 (LTS) (GW), 2007 WL 1958968, at *5 (S.D.N.Y. July 6, 2007).  Thus, "whether separate agreements are actually part of a single transaction is a question of fact, dependent on the intent

There is some logic to ProSight's argument, but it suffers from certain flaws, which together are fatal.  While it is true that Aioi was liable for 48% of the RPP and XOL Contracts (and that Nissan and Taisei were liable for 26% of each), evidence offered at trial indicates that that appears to be a result of the fact that the Fortress Pool routinely allocated the same percentages of liability to each of its three members, rather than any intent by the parties to match up the XOL and RPP Contracts.  Moreover, if the parties had wanted the contracts to be read together, they could have written each corresponding XOL and RPP Contract as a single policy, which they did not do.  Finally, there is nothing in the contracts themselves even requiring that the reinsurers on the RPP Contracts be the same as those on the XOL Contracts, and there is no evidence that ProSight's use of the Fortress Pool for both the XOL and RPP Contracts is anything more than happenstance.  To the contrary, Guarnera's testimony at trial suggested that the RPP and XOL Contracts were purposely kept separate in order to increase the level of competition for each contract, and that ProSight would have been willing to have different reinsurers underwrite the RPP and XOL Contracts.[11]

Accordingly, ProSight's textual argument is unpersuasive.  Thus, while it is Aioi's burden to prove breach, the Court reads the agreements as supporting Aioi's construction unless the extrinsic evidence presented at trial were to establish that the parties intended otherwise.

---

of the parties."  11 Williston on Contracts § 30:26 (4th ed.) (footnotes omitted); *accord Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53-54 (2d Cir. 1999).  Here, for the reasons explained below, the Court concludes that, irrespective of whether the contracts are interrelated under New York law, the terms of the RPP Contracts must be construed separately from those in the XOL Contracts.

[11] Stated differently, were the RPP and XOL Contracts sold together, ProSight/Willis would have had fewer reinsurers from which it could purchase its XOL coverage.  Thus, while Fortress Re ended up agreeing to reinsure both the RPP and XOL Contracts, ProSight/Willis was able to get a more competitive price by keeping them separate.

### C.      The Extrinsic Evidence

#### 1.      ProSight's Witnesses

In support of its reading of the contracts, ProSight called several witnesses: Thomas Guarnera, ProSight's underwriter, Glenn Drew, a former employee of Fortress Re, and Michael Tisdale of Willis.

Guarnera, the ProSight employee who purchased the XOL and RPP Contracts, testified to his belief that, under the RPP Contracts, Aioi was responsible for paying back dollar-for-dollar the amount it received in reinstatement premiums; in other words, he believed that the commutations with Nissan and Taisei would have no effect on the RPP Contracts. However, Guarnera never dealt with Fortress Re directly, and thus had limited knowledge of the negotiations between Fortress Re and Willis. Moreover, Guarnera, like all the persons involved in these contracts, had not actually considered what would happen were the Fortress Pool to break up, making his testimony on what he believed should happen in light of commutations of limited value.[12]

Similarly, Drew testified that the RPP and XOL Contracts operated effectively as one contract, so that the commutations should not affect Aioi's liability. Because Drew worked for Fortress Re, the agent of Aioi, his testimony could have demonstrated that ProSight's view of the relationships between the XOL and RPP Contracts was more than unilateral, but ultimately it was not persuasive. Drew was an assistant underwriter of Kenneth Kornfield , but was not present when Kornfield discussed the XOL and RPP Contracts with Willis, nor did Drew have a

---

[12] Guarnera testified that the RPP Contracts were a method of "prepayments for these reinstatements in advance . . . ." (Tr. Trans. 4-5.) It became clear during his cross-examination, however, that Guarnera used the term "prepayment" as a synonym for payment of the insurance premium. (*See* Tr. Trans. at 304: 7-16) ("Q. Now, when you pay the premium for your homeowner's insurance, do you consider that you are prepaying the cost of rebuilding the house after a fire? . . . A. I suppose so, yes.")

recollection of Kornfield's saying anything that bears on his understanding of the XOL and RPP

Contracts.  In fact, Drew admitted on cross examination that he had no memory of the execution

of the XOL and RPP Contracts at issue in this case.  Moreover, Drew was a named defendant in

a prior lawsuit between Aioi and the officers of Fortress Re, calling into question his

motivations, or at least his objectivity, in testifying in this action.

Tisdale's testimony was also of limited value, as it made apparent that David Mack and

Steven Breen negotiated the XOL and RPP Contracts for Willis, not Tisdale.  Tisdale testified

that Willis viewed the XOL and RPP Contracts "on a combined basis that was placed together."

(Trial Tr. 588:9-19.)  His view of the Contracts' structure stems in part from a conversation he

had with Mack over a decade ago. His recollection of Mack's purported views as to the meaning

of the XOL and RPP Contracts is, to the extent it was offered to show Mack's beliefs about the

proper interpretations of the contracts, inadmissible hearsay.[13]

### 2.    The Contemporaneous Documents

The contemporaneous documents proffered by ProSight are also of limited value.  First,

ProSight introduced no probative documents capturing discussions between ProSight/Willis and

Aioi/Fortress Re concerning the meaning of these contracts.  Second, while ProSight reads these

documents as demonstrating the intent of the parties to hold Aioi accountable for the same

amount of reinstatement premium as ProSight paid, they could just as easily be read as

*describing* the *result* of the contracts, based on the assumption that none of the parties would

commute.  For example, ProSight relies on a renewal document from Willis, which states that the

effect of the 2001 RPP Contracts was to create "3 FREE" reinstatements.  (Ex. 134A; *see also*

Ex. 139 (explaining that the 2000 RP Contracts were provided at a rate of "1 @ $479,441 + 2

---

[13] The Court allowed Tisdale to testify to his conversation with Mack, but explained that it would
be considered only to the extent that it reflected Tisdale's views on how the contracts operated.

FREE").)  The RPP Contracts were set up in such a way that, had Nissan and Taisei remained in the Fortress Pool, the RPP Contracts would have had *the effect* of providing "free" reinstatements of the XOL Contracts.  That this description of the RPP Contracts would have been accurate had the Fortress Pool stayed together, however, does not establish that the RPP Contracts promised "free" reinstatements in the event that the Pool broke up.[14]

As explained above, ProSight has argued that its purpose in buying the RPP Contracts was to promote financial stability by eliminating its duty to pay reinstatement premiums, and the testimony of its witnesses suggests that this is surely the case.  And indeed, the XOL and RPP Contracts were unarguably set up to achieve that purpose, if only the Fortress Re Pool had stayed intact.  However, it became apparent during the trial that, when entering into the RPP Contracts, the parties simply did not consider the possibility that the Fortress Re Pool would break up.[15] Therefore, it is unlikely that ProSight had any particular intent as to how the RPP Contracts should be construed were the Fortress Pool to dissolve.

In sum, the extrinsic evidence offered at trial fails to show that the parties had any particular intent as to what should happen if members of the Fortress Pool disappeared from the XOL and RPP Contracts.   Because it does not appear that the parties contemplated the result of a commutation by members of the Fortress Pool, the language of the RPP Contracts themselves remains the best evidence of the parties' intent.  *Accord Boosey & Hawkes Music Publishers, Ltd.*, *supra*.  As explained above, the better reading of the contracts favors Aioi's interpretation.

---

[14] Importantly, ProSight has presented no evidence that Aioi or its agents ever construed the XOL and RPP Contracts as having a composite premium with "free" reinstatements.

[15] The evidence at trial showed that Kornfield was reviewing and accepting dozens of these contracts per day.  Moreover, the RPP Contracts contain almost exclusively standard industry terms, and there is no evidence of any correspondence between the parties of any correspondence between the parties concerning the RPP Contracts outside of the slips.

Accordingly, the preponderance of the evidence suggests that, under the RPP Contracts, Aioi is only liable for 48% (or, in the case of the 2001 RPP Contracts, 43.2%) of the reinstatement premiums paid by ProSight.

### C.   The Commutations as Reinstatement Premium Payments

ProSight next contends that, even under Aioi's (and now the Court's) interpretation of the RPP Contracts, ProSight should prevail, because in commuting with Taisei and Nissan, ProSight paid those parties reinstatement premiums.  In other words, ProSight would have it that the commutations included the "cost of reinstatement insurance," so that Aioi is liable for 48% of portions of the commutations.

The parties agree that the proof of loss submitted by ProSight during the Taisei reorganization proceedings included an estimate of both its future claims against Taisei—including the XOL and RPP Contracts—and its future net reinstatement premiums.  Similarly, ProSight's commutation offer to Nissan acknowledged that any commutation should take into account future reinstatement premiums owed by ProSight.  The parties disagree, however, as to what this proves.  According to ProSight, the fact that the commutation agreements accounted for the reinstatement premiums means that ProSight paid its reinstatement premiums.  This argument is not convincing.

Irrespective of what future payments and deductions were taken into account when ProSight commuted with Tasei and Nissan, the fact remains that the lump sum payments received by ProSight cancelled the XOL and RPP Contracts between those parties.  In other words, the lump sum commutations were, by definition, made *in avoidance* of further performance under the contracts.  Indeed, it is quite clear that the lump sum payments did not meet the terms for indemnity under the RPP Contracts.  First, at the time of the commutations, ProSight did not yet have an obligation to pay its airline policyholders; thus, ProSight had not yet

suffered a loss covered under the XOL Contracts.  Because ProSight had no obligation to pay reinstatement premiums until it had tapped into its XOL coverage, ProSight did not as of yet owe reinstatement premiums to Tasei and Nissan under the XOL Contracts; instead, the parties were negotiating over *expected* liabilities.  As there was literally no "cost of reinstatement insurance," there was nothing for the RPP Contracts to indemnify, and ProSight's commutations could not simply act as "accelerate[d] potential future obligations."  (ProSight FFCL at 49.)  Relatedly, since ProSight had no obligations to pay reinstatement premiums, the commutation payments cannot meet the Ultimate Net Clause's requirement that the sum paid by ProSight be "in settlement of losses" under the underlying contract.  Rather, the sum paid by ProSight was in settlement of expected, or hypothetical, losses.

ProSight admits that the "amounts due between ProSight and Taisei [] under the XOL and RPP Contracts were not due and owing at the time of commutation," but insists that, "pursuant to the Loss Settlements Combined Clause contained in the XOL and RPP Contracts, ProSight is entitled to settlement indemnity and RPP obligations, respectively, and such settlements are binding upon [Aioi]."  (ProSight FFCL at 50 (internal quotation marks and citation omitted) (alteration in original).)  The Loss Settlements Combined Clause provides that "[a]ll loss by the Reinsured including compromise settlements and the establishment of funds for the settlement of losses shall be binding upon the Reinsurers, providing such settlements are within the terms and conditions of the original policies and/or contracts . . . and within the terms and conditions of this Contract."  (Ex. 2., Art. XV.)  The problem with ProSight's argument, however, is that the commutation agreements were *not* within the "terms and conditions" of the RPP Contract, because no reinstatement premiums were yet owed by Nissan or Taisei.  Rather, the commutation agreements were executed in exchange for cancelling the XOL and RPP Contracts.  Thus, the Loss Settlements Combined Clause is not applicable here.

At a high level, ProSight's argument is that it is inequitable for Aioi to reap the benefits of ProSight's commutations with Taisei and Nissan.  But commutations often result in unearned rewards; indeed, as one of ProSight's witnesses admitted on cross examination, parties engaging in a commutation must consider various uncertainties, including "how their contracts might be interpreted" by a court of law.  (Tr. Trans. 747:24-748:2.)[16]  ProSight should have, and perhaps did, consider the fact that its commutation agreements with Nissan and Taisei could affect the obligations of Aioi; thus, were the Court to rule against Aioi solely in the name of fairness, there is a sense in which it would be ProSight, not Aioi, that would receive the windfall.

### D.    ProSight's Defenses

#### 1.    Statute of Limitations Defense

ProSight argues that Aioi's claims are time barred.  "Under New York law, breach of contract claims must be brought within six years of the alleged breach, regardless of whether plaintiff was aware at the time of the breach that he had a cause of action."  *Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565, 578 (S.D.N.Y. 2005) (citation omitted).  Because Aioi did not file this action until February 25, 2011, argues ProSight, any claim for overbilling that occurred before February 25, 2005 is time barred.  As explained *supra*, only losses from the Queens crash were billed before February 25, 2005.

New York CPLR 206(d) provides that, "[i]n an action based upon a mutual, open and current account, where there have been reciprocal demands between the parties, the time within

---

[16] And indeed, as indicated by documents admitted into evidence during Aioi's cross-examination of a ProSight witness, the commutations were a stroke of good fortune for ProSight as much as they were for Aioi.  Because ProSight, Nissan, and Taisei appeared to have assumed it likely that the World Trade Center events would constitute two events rather than one, ProSight received far more money through its commutations than it otherwise would have.  When asked on cross-examination whether he believed that ProSight received an unfair benefit out of the commutations, a ProSight witness explained, in sum, that a commutation that looks unfair in retrospect is a risk of commutation.

which the action must be commenced shall be computed from the time of the last transaction in the account on either side." "A mutual, open and current account exists when the parties regard the items as constituting one account and as capable of being set off one against the other so that it is only the balance that constitutes the claim. Such an account may be found only where there is an express or implied agreement between two parties to set off their mutual debts against each other." *Simpson v. Mut. of Omaha Ins. Co*, No. 97 Civ. 1339 (JGK), 2000 WL 322780, at *6 (S.D.N.Y. Mar. 28, 2000) (internal quotation marks and citations omitted).

ProSight argues that the "mutual, open and current account" exception is inapplicable here, "[b]ecause ProSight regularly billed and expected payment from Aioi . . . ." (FFCL at 77). As Aioi notes, however, bills close accounts only when they call for a final settlement, and there were no final settlements between the parties here. *Cf. Rodgers v. Roulette Records, Inc.*, 677 F. Supp. 731, 735 (S.D.N.Y. 1998) (finding the "mutual, open and current account" exception inapplicable where the contract "called for statements to be issued every six months" and "any positive balance stated" was expected to be paid at the end of each six month period).

Therefore, Aioi's suit is not time barred.

### 2.    Voluntary Payment Doctrine

ProSight also contends that Aioi's action is barred by the voluntary payment doctrine. "[T]he voluntary payment doctrine . . . bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003); *see also Constellation Power Source, Inc. Select Energy, Inc.*, No. 04 Civ. 983 (MRK), 2007 WL 188135, at *6 (D. Conn. Jan. 23, 2007) (holding that "facts fit New York's voluntary payments doctrine like a glove" where the plaintiff "knowingly and voluntarily paid grossed-up losses for which it did not believe it was responsible in order to achieve other goals regarding the parties'

relationship").  As New York courts have noted, the purpose of the rule is to ensure that, "[w]hen

a party intends to resort to litigation in order to resist paying an unjust demand, that party []

take[s] its position at the time of the demand, and litigate[s] the issue before, rather than after,

payment is made."  *Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*, 118 A.D.2d 532, 535-36

(2d Dep't 1986) (citing *Flower v. Lance,* 59 N.Y. 603, 610 (1975); *Consolidated Fruit Jar Co. v.

Wisner,* 103 A.D. 453, 457 (1st Dep't  1905)).[17]

　　　　At trial, ProSight failed to prove by a preponderance of the evidence that Aioi had "full

knowledge" that ProSight had commuted with Taisei and Nissan.  It is true that Graham Combes

at Quest appears to have known about Taisei's commutation, and that Combes worked in an

office with Jeremy Fall.  However, Combes was on a separate team, and there is no evidence

indicating that he mentioned the commutation to Fall.  ProSight also offered the testimony of

Stephen McCarthy, Senior Vice President and Claims Counsel at ProSight, who claims to have a

general recollection of telling Fall about the commutation.  McCarthy was able to offer few

specifics, however, about the conversation he had with Fall.  (*See* Trial Tr. At 785: 16-18 ("Do I

have knowledge of a date certain where Aioi knew of either communication?  No, I don't have

---

[17] The Restatement (Third) of Restitution & Unjust Enrichment § 6 (2011), explains the
voluntary payment doctrine this way:

> When properly employed, a reference to "voluntary payment" "is
> judicial shorthand for a truth of common experience: that a person
> must often choose to act on the basis of inadequate knowledge,
> assuming the risk that further information may reveal the choice to
> have been less than optimal. A more appropriate statement of the
> voluntary payment rule, therefore, is that money voluntarily paid *in
> the face of a recognized uncertainty as to the existence or extent of
> the payor's obligation to the recipient* may not be recovered, on
> the ground of "mistake," merely because the payment is
> subsequently revealed to have exceeded the true amount of the
> underlying obligation.

(Emphasis in original).

knowledge of a date certain, no.").  Moreover, Fall testified that he was not informed about the

commutation by McCarthy, and the Court finds Fall's testimony credible.[18]

 Accordingly, the voluntary payment doctrine does not apply to this action.

  **3.**  **Account Stated Defense**

 "An account stated is 'an agreement between the parties to an account based upon prior

transactions between them with respect to the correctness of the separate items composing the

account and the balance due, if any, in favor of one party or the other.'" *Kramer, Levin, Nessen,*

*Kamin & Frankel v. Aronoff*, 638 F. Supp. 714, 719 (S.D.N.Y. 1986) (quoting *Chisholm-Ryder*

*Co., Inc. v. Sommer & Sommer,* 70 A.D.2d 429, 431 (4th Dep't 1979)).  Under the account stated

doctrine, "'where an account is made up and rendered, he who receives it is bound to examine

the same, or procure some one to examine it for him; if he admits it to be correct, it becomes a

stated account and is binding on both parties—the balance being the debt which may be sued for

and recovered at law.'" *Id.* (quoting *Lockwood v. Thorne,* 11 N.Y. 170, 174 (1854)).  "Such an

agreement may be implied if a party receiving a statement of account keeps it without objecting

to it within a reasonable time or if the debtor makes partial payment." *LeBoeuf, Lamb, Greene &*

*MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 64 (2d Cir. 1999) (internal quotation marks and

citations omitted).  "Because a party who receives an account is bound to examine the statement

and make all necessary objections, an agreement to pay an indebtedness may be implied if a

party receiving a statement of account keeps it without objecting to it within a reasonable amount

of time, unless fraud, mistake, or other equitable considerations are shown."  *Aronoff*, 638 F.

---

[18] Fall did receive an email from McCarthy indicating that commutation offers had been made to the other members of the Fortress Pool.  (Ex. 123.)  But this in and of itself was not sufficient to put him on notice of the commutations.  Fall testified that he did not learn of the commutations until he was informed of them by Combes in 2010.

Supp. at 719 (citing *Rosenman Colin Freund Lewis & Cohen v. Neuman,* 93 A.D.2d 745 (1st

Dep't 1983)).

ProSight argues that, because Aioi did not object to ProSight's billing for a period of nine

years and made multiple payments during this time period without objection, an account stated

has been created.  Each of ProSight's bills to Aioi showed an amount for "100%" of the "Paid

Loss" or "Reported Loss," and then charged Aioi for 48% of that amount.  As explained above,

the preponderance of the evidence indicates that, before it filed this suit, Aioi was not aware that

the numbers ProSight represented as "Paid Losses" were in fact "accounted" but not paid.  In

other words, Aioi mistakenly believed that ProSight had actually paid 100% of its reinstatement

premium.  Because Aioi's payments were based on a mistake, the accounts stated doctrine is

inapposite here.

### E.      Damages

"Damages for breach of contract are limited to expectation damages—the amount

necessary to put plaintiff in as good a position as if defendant had fulfilled the contract—plus

consequential damages reasonably within the contemplation of the parties at the time the contract

was made."  *Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.,* No. 93 Civ. 0388, 1995 WL

679256, *2 (S.D.N.Y. Nov. 15, 1995) (citing *Bausch & Lomb, Inc. v. Bressler,* 977 F.2d 720,

728 (2d Cir. 1992); *Wallace Steel, Inc. v. Ingersoll-Rand Co.,* 739 F.2d 112, 115 (2d Cir. 1984)).

"Under New York law, 'prejudgment interest is normally recoverable as a matter of right

in an action at law for breach of contract.'"  *Graham v. James,* 144 F.3d 229, 239 (2d Cir. 1998)

(quoting *Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 93 (2d Cir. 1984)); *accord* N.Y. C.P.L.R.

5001(a) (providing that a prevailing party is entitled to prejudgment interest as a matter of right

"upon a sum awarded because of a breach of performance of a contract, or because of an act or

omission depriving or otherwise interfering with title to, or possession or enjoyment of,

property").  Section 5001 "permits a creditor to recover prejudgment interest on unpaid interest and principal payments awarded from the date each payment became due under the terms of the promissory note to the date liability is established."  *Spodek v. Park Prop. Dev. Assocs.,* 96 N.Y.2d 577, 581 (2001).  The rate of interest is nine percent per year.  N.Y. C.P.L.R. 5004.

ProSight has collected from Aioi $3,540,955.27 more than it would have collected if it had billed only for Aioi's share of reinstatement premiums actually paid.[19]  Aioi is therefore entitled to $3,540,955.27, plus prejudgment interest at nine percent per annum.[20]

**IV.     Conclusion**

For the foregoing reasons, the Court finds that ProSight breached its contract with Aioi. There being no just reason for delay, the Clerk of this Court is hereby directed to enter this Final Judgment in the amount of $5,105,578.22 forthwith.

SO ORDERED.

Dated: New York, New York
       June 20, 2013

_____
            J. PAUL OETKEN
        United States District Judge

---

[19] On April 17, 2012, ProSight paid Aioi $82,008.12 following the parties' reconciliation of their obligations arising from the World Trade Center loss.  Aioi has accordingly reduced by that amount the amount of over-payment included in its damage calculations.

[20] Aioi also seeks a declaration of its rights and obligations under the RPP Contract.  "A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract."  *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 54 (1st Dep't 1988) (citations omitted); *see also Piven v. Wolf Haldenstein Adler Freeman & Herz LLP,* No. 08 Civ. 10578 (RJS), 2010 WL 1257326, at *11 (S.D.N.Y. Mar. 12, 2010) (dismissing claim for declaratory relief because "Plaintiffs' rights . . . will be determined pursuant to an adjudication of their [other] claims").  Accordingly, Aioi's claim for declaratory relief is dismissed.